Robert V. Prongay (SBN 270796)
  *rprongay@glancylaw.com*
Charles H. Linehan (SBN 307439)
  *clinehan@glancylaw.com*
Pavithra Rajesh (SBN 323055)
  *prajesh@glancylaw.com*
GLANCY PRONGAY WOLKE & ROTTER LLP
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

*Counsel for Plaintiff Sashanna Nevins*

[Additional Counsel on Signature Page]

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SASHANNA NEVINS, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>BLOOM ENERGY CORPORATION, KR SRIDHAR, SIMON EDWARDS, MACIEJ KURZYMSKI, and DANIEL BERENBAUM,<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |

Plaintiff Sashanna Nevins ("Plaintiff"), individually and on behalf of all others similarly situated, by and through her attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, her counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Bloom Energy Corporation ("Bloom Energy" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Bloom Energy; and (c) review of other publicly available information concerning Bloom Energy.

## NATURE OF THE ACTION AND OVERVIEW

1. This is a class action on behalf of persons and entities that purchased or otherwise acquired Bloom Energy securities between February 27, 2025 and July 8, 2026, inclusive (the "Class Period"). Plaintiff pursues claims against the Defendants under the Securities Exchange Act of 1934 (the "Exchange Act").

2. Bloom Energy designs, manufactures, sells, and installs solid oxide fuel cell systems for on-site power generation in the United States and internationally. Scandium is a rare earth metal used as a dopant to stabilize the zirconia-based ceramic electrolyte in the Company's solid oxide fuel cells.

3. On July 8, 2026, at approximately 1:00 p.m. EST, Hunterbrook Media published a report alleging, among other things, that "***Bloom is, in fact, reliant on Chinese scandium,*** according to global trade data, Chinese corporate filings, satellite imagery, and Hunterbrook's messages with Bloom's suppliers in China."[1] The report states "Hunterbrook traced four separate China-linked routes into Bloom's supply chain — scandium oxide shipped directly to its Delaware plant, plus scandium-bearing ceramics and powders flowing through intermediaries in Thailand, Japan, and South Korea."

---

[1] Unless otherwise stated, all emphasis in bold and italics hereinafter is added.

4.      On this news, Bloom's stock price fell $15.28, or 5.7%, to close at $254.29 per share on July 8, 2026, on unusually heavy trading volume.

5.      Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (1) that Bloom Energy obtained scandium through intermediaries who sourced the metal from China; (2) that, as a result, the Company understated the extent to which it relied on scandium from China; and (3) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

6.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

7.      The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

8.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

9.      Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. In addition, the Company's principal executive offices are located in this District.

10.      In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

**PARTIES**

11.     Plaintiff Sashanna Nevins, as set forth in the accompanying certification, incorporated by reference herein, purchased Bloom Energy securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

12.     Defendant Bloom Energy is incorporated under the laws of Delaware with its principal executive offices located in San Jose, California. Bloom Energy's common stock trades on the New York Stock Exchange ("NYSE") under the symbol "BE."

13.     Defendant KR Sridhar ("Sridhar") was the Company's Chief Executive Officer ("CEO") at all relevant times.

14.     Defendant Simon Edwards ("Edwards") has been the Company's Chief Financial Officer ("CFO") since April 13, 2026.

15.     Defendant Maciej Kurzymski ("Kurzymski") was the Company's Acting Principal Financial Officer from May 2, 2025 until April 12, 2026.

16.     Defendant Daniel Berenbaum ("Berenbaum") was the Company's CFO from April 29, 2024 until May 1, 2025.

17.     Defendants Sridhar, Edwards, Kurzymski and Berenbaum (collectively the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then

materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

18.     Bloom Energy designs, manufactures, sells, and installs solid oxide fuel cell systems for on-site power generation in the United States and internationally. Scandium is a rare earth metal used as a dopant to stabilize the zirconia-based ceramic electrolyte in the Company's solid oxide fuel cells.

### Materially False and Misleading

### Statements Issued During the Class Period

19.     The Class Period begins on February 27, 2025. On that day, the Company hosted an earnings call in connection with the release of its fourth quarter and full year 2024 financial results. During the earnings call, Defendant Sridhar purported to describe the Company's supply chain, stating in relevant part:

> And one ***important aspect*** also that ***helps*** us, as ***we are not dependent on China for a supply chain.*** And ***that is super important*** as we look at where we are today.

20.     On February 27, 2025, the Company submitted its annual report for the fiscal year ended December 31, 2024 on a Form 10-K filed with the SEC. The annual report affirmed the previously reported financial results. The annual report further alleged to describe the Company's supply chain, stating that the Company's "***supply chain does not have significant exposure to China***." The annual report also reiterated the same statement discussing potential supply chain constraints, stating as follows in relevant part:

> **Supply Chain**
>
> *                    *                    *
>
> There have been a number of disruptions throughout the global supply chain; demand for certain components has outpaced the return of the global supply chain to full production. Though the supply constraints for a majority of our raw materials and components are expected to ease in 2025, we have experienced an increase in lead times with respect to the delivery of some of our components due to a variety of factors, including supply shortages, shipping delays and labor shortages. Additional new trade tariffs or other trade protection measures that are being considered by the new U.S. administration could have a disruptive impact on

our supply chain. While ***our supply chain does not have significant exposure to China,*** significant tariffs on imports from other countries where we do source materials could materially impact our costs.

\*                              \*                              \*

***Supply Chain Constraints***

We continue to see effects from global supply chain tightness due to the current inflationary environment, war in Ukraine, and trade tensions between the U.S. and China. We are not aware of, and do not expect any significant direct impact on our business or supply chain from the armed conflict in Israel and neighboring areas. While we have not experienced any significant component shortages to date, we are facing pressures from inflation. These dynamics could worsen as a result of continued geopolitical instability or escalation of current military conflicts or trade tensions. The new U.S. federal administration has implemented tariffs on steel and aluminum and has discussed implementing a number of other trade tariffs which may impact our operations. ***Our supply chain does not have significant exposure to China,*** but significant tariffs on imports from other countries where we do source materials could materially impact our costs.

21.    On April 30, 2025, the Company held an earnings call in connection with the release of its first quarter 2025 financial results. During the earnings call, Defendant Sridhar unequivocally "***there is no China supply chain for us***." He stated explicitly "***we are not dependent on China for scandium.***" Specifically, he stated as follows in relevant part:

We have been developing, diversifying and fortifying our supply base for years to mitigate the impacts of any particular country or supplier. We have two manufacturing and assembly facilities and they are both located in the United States. Our products are proudly made in America. Yes, we do import materials and components from abroad, but not from China. The majority of our material spend is in custom-made components unique to us, which give us control over pricing and sourcing.

\*                              \*                              \*

So, let me start with the simple question first on margins. So, we had guided for the year at 29%. And we said, because of all the reasons that I said in my script, but let me reiterate very simply, ***we're not dependent on China,*** we have a multi-country strategy, but predominantly we are a U.S. manufacturer with our two factories here in the U.S., Made in America products. For all those reasons, we can mitigate the impact of tariffs, if they continue the way it is today, to the 100 basis points.

\*                              \*                              \*

What you need to understand is, none of our critical materials come from contested supply chains or war zones, and ***there is no China supply chain for us.*** Okay? So -- and with respect to our -- I spoke in my script about commercial off-the-shelf, it's a small portion of our buy, custom-made parts for us, where we have developed vendors over the last 15 years is what we depend on.

\*                              \*                              \*

CLASS ACTION COMPLAINT

5

So, let me address the scandium question first, and I'll have Dan explain why we change metrics and how we change metrics right after that. So, the first thing for you to know is, like, *number one, we are not dependent on China for scandium. I can state that very clearly.* Okay.

22.    On April 30, 2025, the Company submitted its quarterly report for the period ended March 31, 2025 on a Form 10-Q filed with the SEC, affirming the previously reported financial results. The report purported to describe the Company's supply chain, alleging that the Company's "*supply chain does not have significant exposure to China,*" stating as follows in relevant part:

*Supply Chain Constraints*

We continue to see effects from global supply chain tightness due to the current inflationary environment, war in Ukraine, and trade tensions between the U.S. and China. We are not aware of, and do not expect any significant direct impact on our business or supply chain from the armed conflict in Israel and neighboring areas. While we have not experienced any significant component shortages to date, we are facing pressures from inflation. These dynamics could worsen as a result of continued geopolitical instability or escalation of current military conflicts or trade tensions. The new U.S. federal administration has implemented new tariffs on all trade partners. *Our supply chain is not dependent on China,* but significant tariffs on imports from other countries where we do source materials could impact our costs.

23.    On July 31, 2025, the Company submitted its quarterly report for the period ended June 30, 2025 on a Form 10-Q filed with the SEC, affirming the second quarter 2025 financial results that were issued in a press release the same day. The report purported to describe the Company's supply chain, stating that the Company's "*supply chain does not have significant exposure to China*":

*Supply Chain Constraints and Trade Tariff Uncertainties*

We continue to see effects from global supply chain tightness due to the current inflationary environment, war in Ukraine, and trade tensions between the U.S. and China as well as other countries. We are not aware of, and do not expect any significant direct impact on our business or supply chain from the armed conflicts in the Middle East. While we have not experienced any significant component shortages to date, we are facing pressures from inflation. These dynamics could worsen as a result of continued geopolitical instability or escalation of current military conflicts or trade tensions. The current administration has implemented new tariffs on all trade partners and is in the process of negotiating trade deals. As of the date of the filing on Form 10Q, in light of other cost cutting measures we have implemented we currently expect an adverse impact on gross margin of approximately one percent for the fiscal year 2025.

*Our supply chain is not dependent on China,* but significant tariffs on imports from other countries where we do source materials could impact our costs.

24.     On September 12, 2025, media outlet Semafor published an article entitled "Bloom Energy's KR Sridhar on why all CEOs need a power strategy" by Andrew Edgecliffe-Johnson. The article contained an interview with the Defendant Sridhar. Durning the interview, Sridhar alleged "***Starting in 2004, we said we are not going to depend on a Chinese supply chain***. If we believe in energy abundance for all, there cannot be a single source to strangle you," he said.

25.     On October 28, 2025, the Company submitted its quarterly report for the period ended September 30, 2025 on a Form 10-Q filed with the SEC, affirming the third quarter 2025 financial results reported in a press release the same day. The report purported to describe the Company's supply chain, alleging that the Company's "***supply chain does not have significant exposure to China***," and purported to assure investors China merely "supplies multiple components including 70% of rare earth metals used in electronic and electromechanical components that ***are part of our tier 2 and tier 3 sub-assembly suppliers.***" Specifically, the report stated, in relevant part:

Supply Chain Constraints and Trade Tariff Uncertainties

We continue to see effects from global supply chain tightness due to the current inflationary environment, war in Ukraine, armed conflicts in the Middle East and trade tensions between the U.S. and China as well as other countries. While we have not experienced any significant component shortages to date, we are facing pressures from inflation. These dynamics could worsen as a result of continued geopolitical instability or escalation of current military conflicts or trade tensions. The current administration has implemented new tariffs on all trade partners and is in the process of negotiating trade deals. As of the date of the filing on Form 10-Q, in light of other cost cutting measures we have implemented we currently expect an adverse impact on gross margin of approximately one percent for the fiscal year 2025.

***Our supply chain is not dependent on China.*** However, ***China as a country supplies multiple components including 70% of rare earth metals used in electronic and electromechanical components that are part of our tier 2 and tier 3 sub-assembly suppliers.*** The continued escalation of trade tensions between China and the U.S. could impact our ability to source these components.

26.     On February 5, 2026, the Company submitted its annual report for the fiscal year ended December 31, 2025 on a Form 10-K filed with the SEC. The annual report affirmed the previously reported financial results. The annual report alleged to describe the Company's supply chain, stating that the Company's "***supply chain does not have significant exposure to China***" and purported to assured investors China merely "supplies multiple components including rare

earth metals and compounds *used in electronic and electromechanical components that are part of our tier 2 and tier 3 sub-assembly suppliers.*" Specifically, the annual report stated as follows in relevant part:

> The past year presented a number of disruptions throughout the global supply chain, which we worked to mitigate by managing supplier allocations, increasing throughput and productivity at existing suppliers, qualifying new suppliers, and eliminating dependency on constrained materials. We have enacted multiple initiatives to mitigate the impact of trade tariffs and other trade protection measures to our cost and supply availability. While *our supply chain does not have significant exposure to China,* significant tariffs on imports from other countries where we do source materials could materially impact our costs.

> \*                    \*                    \*

> **Supply Chain Constraints and Trade Tariff Uncertainties**

> We continue to see effects from global supply chain tightness due to factors such as trade tensions between the U.S. and China, tariffs the current administration has also implemented on all trade partners, war and armed conflicts in Ukraine and the Middle East, and strain in relationships between the U.S. and Europe as a result of issues such as defense. While we have not experienced any significant component shortages to date, such factors, as well as challenges we face as a result of our need to expand our capacity due to the growth of our business, have placed pressure on our supply chain. Measures we are taking to mitigate these supply chain issues include expanding our supply chain base and reducing where feasible significant dependencies on any singular supply chain vendor. However, these measures may not be successful and dynamics could worsen as a result of continued geopolitical instability or escalation of current military conflicts or trade tensions. Also, additional internal factors such as continual evolution to improve our products which may require changes in the components utilized and pressure to reduce costs of components in efforts to improve margins further complicate the mitigation measures. We are a key customer for several of our suppliers, and are working with them to facilitate the ability to ramp as our own need for supplies from them increase. *Our supply chain is not dependent on China. However, China as a country supplies multiple components including rare earth metals and compounds used in electronic and electromechanical components that are part of our tier 2 and tier 3 sub-assembly suppliers.* The continued escalation of trade tensions between China and the U.S. could impact our ability to source these rare earth metals and components.

27.    On June 10, 2026, The Wall Street Journal published a video interview with Defendant Sridhar, entitled "KR Sridhar on the Growing Energy Demands of AI Data Centers." During the interview, the interviewer asked "*the one notable country that you are not sourcing from, is China*" to which Defendant Sridhar replied "*yes*." Defendant Sridhar stated unequivocally that "*very early on in the company we made a decision that we are only going to depend on*

*supply chains that we can completely trust and that [China] was a country we avoided,*" he said, stating "2005" was when that decision was made.

28.    On July 7, 2026, Bloom Energy published a blog post authored by its COO Satish Chitoori entitled "Demystifying Scandium Oxide: Why It Matters in Bloom Fuel Cells." It stated, in relevant part:

> **Building a resilient supply chain**
>
> In today's world, technology leadership depends on supply chain resiliency.
>
> Over many years, Bloom has developed proprietary intellectual property and manufacturing know-how to economically recover scandium oxide from multiple industrial sources.
>
> *Today, we are able to source scandium oxide from multiple sources and suppliers across multiple countries.*
>
> *No single supplier determines our destiny. No single country does either. Bloom's sourcing approach is intentionally diversified,* built on proprietary processes and long-standing relationships.
>
> To protect the resilience of our supply chain, Bloom maintains strict confidentiality around its sourcing network. Supplier relationships, sourcing volumes, and procurement strategies are proprietary and are not shared across our vendor base.
>
> We believe we are the world's largest consumer of scandium oxide, so this capability represents a meaningful competitive advantage that extends well beyond the fuel cell itself.

29.    The above statements identified in ¶¶19-28 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (1) that Bloom Energy obtained scandium through intermediaries who sourced the metal from China; (2) that, as a result, the Company understated the extent to which it relied on scandium from China; and (3) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

### Disclosures at the End of the Class Period

30.    On July 8, 2026, at approximately 1:00 p.m. EST, Hunterbrook Media published a report entitled "Bloom's Big Lie" (the "Report"). The Report alleged, among other things, that "*Bloom is, in fact, reliant on Chinese scandium,* according to global trade data, Chinese

corporate filings, satellite imagery, and Hunterbrook's messages with Bloom's suppliers in China." The Report states "Hunterbrook traced four separate China-linked routes into Bloom's supply chain — scandium oxide shipped directly to its Delaware plant, plus scandium-bearing ceramics and powders flowing through intermediaries in Thailand, Japan, and South Korea." Specifically, the Report summarizes its claims as follows, in relevant part:

> • The problem: Bloom is, in fact, reliant on Chinese scandium, according to global trade data, Chinese corporate filings, satellite imagery, and Hunterbrook's messages with Bloom's suppliers in China. Hunterbrook traced four separate China-linked routes into Bloom's supply chain — scandium oxide shipped directly to its Delaware plant, plus scandium-bearing ceramics and powders flowing through intermediaries in Thailand, Japan, and South Korea. A sales representative of Hunan Oriental Scandium — which claims over 50% of the global market for fuel-cell-grade scandium oxide — told Hunterbrook: "We are also BE's largest supplier of scandium." Asked how the material reaches U.S. customers under Beijing's controls: "Not exported directly." Hunan Oriental was featured at Bloom's May supplier conference as one of three Chinese scandium-linked suppliers. One received Bloom's "Impact Supplier Award."

31. According to the Report, Hunterbrook "found four separate trade routes that appear to show Chinese scandium is still part of Bloom's supply chain, and the material is reaching the U.S. through intermediary countries." Based on conversations with a major scandium producer in China (who claimed to be Bloom Energy's largest supplier) and commercially available trade data, the Report claimed that Bloom Energy received scandium directly from China on 4 occasions between August 2023 and May 2024. Specifically, the Report stated, in relevant part:

> **Inside The China Supply Chain Bloom Said It Didn't Have**
>
> Hunan Oriental Scandium is a major scandium producer in China. When a Hunterbrook reporter reached out about shipments to the U.S., a representative listed the company's credentials.
>
> "Our global market share for 4N scandium oxide generally exceeds 50%," they wrote, adding: "We are also BE's largest supplier of scandium." BE is the ticker symbol for Bloom Energy.
>
> [image omitted]
>
> A bold claim by the Chinese supplier, as Bloom's CEO said his company has no China supply chain.
>
> But trade data and company announcements corroborate longstanding ties between Bloom and Hunan Oriental, which is a subsidiary of LB Group, a large Chinese chemicals company.

Hunan Oriental shipped scandium oxide directly to Bloom in Newark, Delaware, at least four times between August 2023 and May 2024, according to commercially available trade data. The product descriptions include "scandium oxide" and "scandium oxide drum pits."

*                    *                    *

But while Hunan Oriental claims to be one of Bloom's top suppliers, no further shipments to the fuel cell manufacturer appeared in that trade data, after the scandium deliveries in 2023 and 2024.

So how does the material reach Bloom now, especially given the tighter Chinese export controls on rare earths that took effect in 2025?

When the Hunterbrook reporter asked the Hunan Oriental sales rep how the company is sending its scandium to U.S. customers, the response was blunt.

"Not exported directly," they wrote.

32.    The Report also cited securities filings and import data to claim that scandium was routed from China through intermediaries to Bloom in U.S. Specifically, the Report claimed, in relevant part:

**The Playbook — And the Money Running It**

A Chinese securities filing gives insight into Bloom's supply chain playbook and how one of its partners has apparently obfuscated Bloom's reliance on Chinese products.

Zhejiang Chunhui Intelligent Control, a Chinese manufacturer, has supplied Bloom with the temperature sensors that monitor its fuel cell stacks since 2007. In a November 2025 disclosure to the Shenzhen Stock Exchange, reviewed and translated from Chinese by Hunterbrook, Chunhui describes itself as Bloom's dominant sensor supplier, accounting for more than 70% of the American company's purchases of the part over a roughly two-decade relationship.

The sensors are not scandium. But the filing lays out, in Chunhui's own words, how Bloom is trying to limit its exposure to Chinese trade. Bloom "has begun changing its supply-chain process" — directing Chunhui to ship its products not to the United States, but to Bloom's "other overseas suppliers," who "complete assembly before shipping on to the United States," in order to "gradually reduce direct exports to the U.S. and thereby mitigate the impact of U.S. tariff policies."

*                    *                    *

The Chinese filing even names Bloom's waypoints.

Starting in 2025, Chunhui began routing its Bloom-bound product through Kaori Heat Treatment in Taiwan and MTAR Technologies in India. Both are Bloom suppliers. The trade data matches: Chunhui's direct deliveries to the U.S. fall during this period and become sporadic, while the weight of shipments from Kaori and MTAR to Bloom increases significantly.

Chunhui's direct sales to Bloom dropped from roughly 31% of its revenue to under 13% as the rerouting took hold.

Bloom's recent 10-K disclosure appears to confirm that the company is using the same playbook with rare earth metals and compounds from China by routing them to the company's "tier 2 and tier 3 sub-assembly suppliers."

Hunterbrook looked at Bloom's shipments over the past two years to uncover the waypoints through which Bloom receives Chinese scandium. We identified three trade routes that appear to obscure the Chinese origin of Bloom's scandium imports.

**Route 1: A Major Chinese Supplier's Thai Subsidiary**

According to the import data we reviewed, Glory Winner (Thailand) Co. Ltd. shipped more than 154 metric tons of ceramic electrolyte membranes to Bloom between July 2024 and November 2025. Glory Winner is a subsidiary of China's Three Circle Group, which has been identified as a "core supplier" for Bloom in Chinese media.

Scandium is a key component of the ceramic electrolyte membranes in Bloom's fuel cells, per the company's own patents and multiple fuel cell experts interviewed



[0011] A solid oxide fuel cell (SOFC) electrolyte composition includes zirconia stabilized with scandia, and at least one of magnesia, zinc oxide, indium oxide, and gallium oxide, and optionally ceria.

*An excerpt from one of many Bloom fuel cell patents relying on "scandia." Source: Bloom patent.*

by Hunterbrook.

The United States Geological Survey (USGS) does not list Thailand as a scandium producer.

So while Bloom's scandium-containing parts sourced from Glory Winner may not be shipped directly from China, trade data and Chinese industry coverage indicate that they are in fact of Chinese origin.

A diagram in Three Circle's 2026 draft IPO prospectus for the Hong Kong Stock Exchange shows that the company's China-based operation is supplying "raw materials and equipment" to Glory Winner. Elsewhere in the document, Three

Circle says "the main raw materials are all sourced domestically," referring to China.



A *diagram in Three Circle's 2026 draft IPO prospectus* showing a transfer of "raw materials and equipment" from Three Circle's China operations to Glory Winner. Source: HKEXnews

Three Circle's 2021 response to a Shenzhen Stock Exchange inquiry letter suggests that this trade route was set up in 2019 and designed to avoid U.S. tariffs.

"To mitigate the impact of the additional tariffs on fuel cell separator plates, the company consulted with relevant customers and implemented the following measures," the document states. "In July 2019, it established a new subsidiary, Glory Winner (Thailand) Co., Ltd., and relocated the fuel cell separator plates business to Thailand, assigning production and sales responsibilities to the new subsidiary."

But Three Circle did not always use the Thai route.

Trade data shows a related entity, Hong Kong Three Circle Electronic, shipping "ceramic substrate for fuel cell application" directly to Bloom under its own name between 2024 and 2025.

Glory Winner hasn't shipped to Bloom since November 2025 according to the trade data, over six months after the Bloom CEO's repeated denial of reliance on Chinese scandium during the earnings call. But Three Circle told investors as recently as December that it "has established a long-term cooperative relationship with Bloom Energy and is its main supplier of fuel cell membrane sheets," according to Chinese media.

The company, which happens to be listing in Hong Kong this week, did not name Bloom directly in its IPO prospectus. Instead it said its largest customer in 2023, 2024, and 2025 is a "public company listed in the U.S. that mainly engages in development and production of reliable new energy products." It also disclosed:

"SOFC electrolyte sheets have been supplied to a leading North American fuel cell company."

\*                              \*                              \*

**Route 2: A Japanese Supplier's Chinese Trading Arm**

Bloom also receives "scandia-stabilized zirconia powder" from Daiichi Kigenso Kagaku Kogyo (DKK) in Japan, according to import records reviewed by Hunterbrook. The powder is the raw version of the critical material the fuel cell manufacturer needs for its electrolytes. Since September 2024, Bloom has received almost 300 drums of "scandia" or "scandia-stabilized" powder, though not all was labeled as zirconia powder. While they were shipped from Japan, a look at DKK's corporate structure suggests the powder's actual provenance is China.

[image omitted]

The Japanese materials manufacturer's corporate network includes two Chinese "associated companies" and one Chinese subsidiary, DKK (Shanghai) Materials Trading, which specializes in zirconium compounds.

Its website features scandium prominently. The product page links to DKK's Japanese website of zirconia for solid oxide fuel cells, the type of scandia-stabilized zirconia powder Bloom bought from DKK, suggesting the Japanese company sources from its Chinese subsidiary.

\*                              \*                              \*

In recent financial filings, DKK does not mention scandium specifically, but the company flags that for "medium-to-heavy rare earths, production is heavily concentrated in China, and the impact of export restrictions persists."

A 2026 DKK-commissioned analyst report expressly flags that the company uses scandium oxide in "zirconia for fuel cells" and that the material is subject to Chinese export controls, suggesting once again that the company is sourcing it from China.

\*                              \*                              \*

**Route 3: Through Bloom's Partners in South Korea**

In 2024, Korean media reported a local success story. The company KV Materials had effectively localized the production of "electrolyte raw materials and powder" in Korea and would supply these products to Amosense, "a company specializing in materials and components," to be turned into electrolyte substrates.

Subsequent industry coverage confirmed which trade partner Amosense was producing these components for: "Amosense will accelerate earnings growth by gradually expanding supply volumes following the shipment of the initial batch of solid oxide fuel cell (SOFC) ceramic substrates for Bloom Energy, which was prepared in the first week of March," Daily Invest reported.

The shipments seem to be ultimately headed to the U.S. to be used for Bloom's data center push, according to Korean news reports: "As Bloom Energy's orders expand due to the surge in demand for AI data centers, Amosense's ceramic

substrate production capacity is also expected to expand more than threefold to approximately 50 billion won by the third quarter of this year," Pinpoint News wrote.

Bloom's ceramic electrolyte substrates contain scandium, according to its patents. But the USGS doesn't list South Korea as a nation in which scandium resources have been identified, meaning the scandium baked into the Korean ceramic electrolyte substrates Bloom bought had to come from somewhere else.

The most likely place seems to be China. KV Materials, which provides the "electrolyte raw materials," is actually owned by Vital Thin Film Materials, a Chinese scandium-products maker and part of Vital Group, corporate records show.

In January 2024, a Korean newspaper reported that Vital Group had shifted part of its fuel-cell business into the subsidiary with 20 billion won invested into the production. KV's CEO pledged to make the company "a core hub of Vital Group."

According to filings in Korea's corporate disclosure database, KV Materials spent 127 billion won ($83 million) purchasing from its parent company, Vital's Hong Kong subsidiary, in 2025.

If the scandium powder feeding Bloom traces back to a Chinese parent, then Bloom's Korean operation would not take China out of the supply chain. It would transform the scandium and obscure its ultimate origin, turning Chinese-sourced scandium into a Korean electrolyte substrate before it reaches the United States.

Vital itself appears to be one of Bloom's key suppliers. Its logo showed up on the same wall at Bloom's May 2026 supplier conference as Hunan Oriental Scandium's and Three Circle's logos.

[image omitted]

Bloom even seemed to have bestowed a special honor on the company: Vital apparently received the "Impact Supplier Award 2025." The award is given to a supply partner who "significantly advanced our operational success, strengthened resilience and enabled scalable growth across the value chain," according to a video Bloom posted on its LinkedIn page.

Vital's North American subsidiary, Vital & FHR North America, has been a known Bloom supplier since 2023 — but the Chinese company's apparent involvement in Korean electrolyte substrate production for Bloom has not been reported before.

**The Ties That Bind**

Bloom's scandium supply chain seemingly has at least four separate links to China: via Hunan Oriental, Japan, Korea, and Thailand.

And Chinese records show Bloom's relationship with Chinese scandium suppliers goes back more than a decade, despite the CEO's claims that Bloom has avoided the country since as early as 2005 and never had to "decouple" from China.

33.    The Report cited claims by energy industry experts and scandium suppliers to support its claims that Bloom relied on scandium from China, stating in relevant part:

"I don't know of anywhere else they would get it from that's of the scale that they would need," Eric Wachsman, director of the Maryland Energy Innovation Institute, told Hunterbrook about Bloom's scandium needs. "You have to be able to purify it, and that purification process tends to be primarily in China."

One way Bloom appears to be obfuscating its reliance on China is by rerouting shipments through intermediary countries. This may look better in the trade data, and provide some support for Sridhar's claim that Bloom sources from "multiple countries" across "multiple continents," but it doesn't change the fact that a large chunk of the scandium is still from China: a single point of failure supply chain risk.

And China can cut off that scandium supply regardless of how indirectly it flows to Bloom.

In fact, multiple Chinese scandium suppliers told Hunterbrook that China's Ministry of Commerce requires end users of scandium — not just exporters — to provide information to the government regarding its planned use for the material. If the Chinese Communist Party does not approve, it can block the exports.

Bloom's reliance on this supply chain means China may have an off-switch on America's data center build-out — at least, data centers dependent on Bloom.

34.    On this news, Bloom's stock price fell $15.28, or 5.7%, to close at $254.29 per share on July 8, 2026, on unusually heavy trading volume.

## CLASS ACTION ALLEGATIONS

35.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired Bloom Energy securities between February 27, 2025 and July 8, 2026, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

36.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Bloom Energy's shares actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class. Millions of Bloom Energy shares were traded publicly during the Class Period on the NYSE. Record owners and other members of the Class

may be identified from records maintained by Bloom Energy or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

37.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

38.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

39.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Bloom Energy; and

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

40.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**UNDISCLOSED ADVERSE FACTS**

41.    The market for Bloom Energy's securities was open, well-developed and efficient at all relevant times. As a result of these materially false and/or misleading statements, and/or failures to disclose, Bloom Energy's securities traded at artificially inflated prices during the Class

Period. Plaintiff and other members of the Class purchased or otherwise acquired Bloom Energy's securities relying upon the integrity of the market price of the Company's securities and market information relating to Bloom Energy, and have been damaged thereby.

42. During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Bloom Energy's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading. The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about Bloom Energy's business, operations, and prospects as alleged herein.

43. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Bloom Energy's financial well-being and prospects. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## LOSS CAUSATION

44. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

45. During the Class Period, Plaintiff and the Class purchased Bloom Energy's securities at artificially inflated prices and were damaged thereby. The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the

information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

**SCIENTER ALLEGATIONS**

46. As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Bloom Energy, their control over, and/or receipt and/or modification of Bloom Energy's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Bloom Energy, participated in the fraudulent scheme alleged herein.

**APPLICABILITY OF PRESUMPTION OF RELIANCE**

**(FRAUD-ON-THE-MARKET DOCTRINE)**

47. The market for Bloom Energy's securities was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Bloom Energy's securities traded at artificially inflated prices during the Class Period. On June 22, 2026, the Company's share price closed at a Class Period high of $345.85 per share. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Bloom Energy's securities and market information relating to Bloom Energy, and have been damaged thereby.

48. During the Class Period, the artificial inflation of Bloom Energy's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Bloom Energy's business, prospects, and operations. These material

misstatements and/or omissions created an unrealistically positive assessment of Bloom Energy and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

49. At all relevant times, the market for Bloom Energy's securities was an efficient market for the following reasons, among others:

(a) Bloom Energy shares met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b) As a regulated issuer, Bloom Energy filed periodic public reports with the SEC and/or the NYSE;

(c) Bloom Energy regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d) Bloom Energy was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

50. As a result of the foregoing, the market for Bloom Energy's securities promptly digested current information regarding Bloom Energy from all publicly available sources and reflected such information in Bloom Energy's share price. Under these circumstances, all purchasers of Bloom Energy's securities during the Class Period suffered similar injury through their purchase of Bloom Energy's securities at artificially inflated prices and a presumption of reliance applies.

51.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

### NO SAFE HARBOR

52.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Bloom Energy who knew that the statement was false when made.

**FIRST CLAIM**

**Violation of Section 10(b) of The Exchange Act and**

**Rule 10b-5 Promulgated Thereunder**

**Against All Defendants**

53.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

54.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Bloom Energy's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

55.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Bloom Energy's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

56.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Bloom Energy's financial well-being and prospects, as specified herein.

57.    Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Bloom Energy's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts

necessary in order to make the statements made about Bloom Energy and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

58.     Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

59.     Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Bloom Energy's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

60.     As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Bloom Energy's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Bloom Energy's securities during the Class Period at artificially high prices and were damaged thereby.

61.     At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Bloom Energy was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Bloom Energy securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

62.     By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

63.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**SECOND CLAIM**

**Violation of Section 20(a) of The Exchange Act**

**Against the Individual Defendants**

64.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

65.     Individual Defendants acted as controlling persons of Bloom Energy within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level

positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

66.    In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

67.    As set forth above, Bloom Energy and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED: July 30, 2026                    **GLANCY PRONGAY WOLKE & ROTTER LLP**

By:   */s/ Pavithra Rajesh*
Robert V. Prongay
Charles H. Linehan
Pavithra Rajesh
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: CLinehan@glancylaw.com
          PRajesh@glancylaw.com

**THE LAW OFFICES OF FRANK R. CRUZ**
Frank R. Cruz
2121 Avenue of the Stars, Suite 800
Century City, CA 90067
Telephone: (310) 914-5007

*Attorneys for Plaintiff Sashanna Nevins*

**SWORN CERTIFICATION OF PLAINTIFF**

**BLOOM ENERGY CORPORATION SECURITIES LITIGATION**

I, Sashanna Nevins, certify that:

1.  I have reviewed the Complaint, adopt its allegations, and authorize the filing of the Complaint on my behalf.

2.  I did not purchase the Bloom Energy Corporation securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action arising under this federal securities laws.

3.  I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4.  My transactions in Bloom Energy Corporation securities during the Class Period set forth in the Complaint are as follows:

    (See attached transactions)

5.  I have not sought to serve, nor served, as a representative party on behalf of a class in any action under the federal securities laws (15 U.S. Code, Chapter 2B; and 15 U.S. Code, Chapter 2A, Subchapter I) during the last three years.

6.  I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court, including the award to a representative plaintiff of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

7/21/2026
_____
Date

_____
Sashanna Nevins

**Sashanna Nevins's Transactions in Bloom Energy Corporation (BE)**

| Date | Transaction Type | Quantity | Unit Price |
|---|---|---|---|
| 7/6/2026 | Bought | 220 | $295.0000 |
| 7/8/2026 | Bought | 20 | $265.0000 |
| 7/8/2026 | Sold | -20 | $248.9184 |